UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

GREEKTOWN HOLDINGS, LLC, et al.,

|  |  |
|---|---|
| Debtor(s), | Bankr. Case No. 08-53104<br>Chapter 11<br>Honorable Walter Shapero |

---

TED GATZAROS and MARY GATZAROS,

|  |  |
|---|---|
| Plaintiffs, | Case No. 13-10291 |
|  | Paul D. Borman<br>United States District Judge |
| v. |  |
| SAULT STE. MARIE TRIBE OF<br>CHIPPEWA INDIANS, and | Adv. Pro. 12-06160 |
| THE KEWADIN CASINO GAMING<br>AUTHORITY, |  |
| Defendants. |  |

---

OPINION AND ORDER (1) GRANTING THE DEFENDANTS' MOTION TO DISMISS FOR
FAILURE TO STATE A CLAIM AND (2) DENYING MOTION TO HOLD PLAINTIFFS IN
CONTEMPT OF COURT (ECF NO. 7)

Before the Court is the Defendants' Motion to Dismiss for Failure to State a Claim and

Motion to Hold Gatzaros Plaintiffs in Contempt of Court for Violating Court Order. (ECF No. 7.)

Plaintiffs filed a response (ECF No. 14) and Defendants filed a reply (ECF No. 16). The Court held

a hearing on May 22, 2013. For the reasons that follow, the Court GRANTS the motion to dismiss

1

and DENIES the motion to hold Plaintiffs in contempt.

**INTRODUCTION**

This Adversary Proceeding arises in connection with the longstanding Greektown Bankruptcy litigation. Plaintiffs Ted and Maria Gatzaros ("the Gatzaros") have filed a Complaint for Declaratory Relief against the Sault Ste. Marie Tribe of Chippewa Indians and Kewadin Gaming Authority (collectively hereafter "the Tribe"). The discrete issue presented in this Adversary Proceeding is whether the Gatzaros, as third party beneficiaries of a Guaranty Agreement, can unilaterally modify the Guaranty Agreement to remove a limitation provision so that the Tribe becomes obligated on its guaranty under the Agreement, when it is undisputed that but for the modification, the Tribe would not be obligated to the Gatzaros under the Guaranty Agreement. The Gatzaros rely on a waiver provision of the Guaranty Agreement that they argue gives them the right to unilaterally alter the terms of the Tribe's Funding Obligation under the clear language of the agreement. The Gatzaros argue that the limitation provision is a term of the Funding Obligation and therefore subject to unilateral alteration. The Gatzaros also argue that the Tribe has waived any conceivable defense it may have to the claims asserted in this action. The Gatzaros also have filed an amended complaint that they argue removes any claim from this action that would be subject to the Claims Bar Order entered by this Court on July 13, 2012, in an earlier Adversary Proceeding related to the Greektown Bankruptcy.

The Tribe responds that the attempted modification of the Guaranty Agreement to remove the limitation provision without the Tribe's consent is prohibited under the clear language of the Agreement. The Tribe argues that the limitation provision is not a term of the Funding Obligation but a term of the Guaranty Agreement and that the Gatzaros cannot unilaterally alter the limitation

2

provision.  The Tribe argues that the Gatzaros's attempt to unilaterally revoke the limitation provision of the Guaranty Agreement is prohibited by the clear language of the Agreement, which requires that the Tribe consent to such a modification.  The Tribe further argues that the only defenses waived under the Guaranty Agreement are those which arise under principles of guaranty or suretyship.  They assert that they have never waived the non-suretyship defenses that they assert in this action, i.e. lack of good faith and fair dealing and the defense that the Gatzaros's interpretation of the Agreement would eliminate or render the limitation provision illusory.  The Tribe further argues that the filing of this action violates the Claims Bar Order entered by this Court on July 13, 2012.  The Tribe asks the Court to hold the Gatzaros in contempt of Court for filing this action in violation of this Court's previously issued Claims Bar Order.

## I.   BACKGROUND

### A.   Procedural History of this Adversary Proceeding

The Gatzaros filed this one-count Complaint for Declaratory Relief against the Tribe in Wayne County Circuit Court on November 14, 2012.  ("The Gatzaros Action".)  On December 14, 2012, pursuant to 28 U.S.C. § 1334, the Tribe filed a Notice of Removal of the Gatzaros Action to the United States Bankruptcy Court for the Eastern District of Michigan, as a related action to the pending bankruptcy matter, *In re: Greektown Holdings, LLC, et al.*, Bankr. Case No. 08-53104.  The case was assigned Adversary Proceeding No. 12-06160. (ECF No. 1, Notice of Removal, E.D. Mich. Bankr. Adv. Pro. Case No. 12-06160.)

On December 17, 2012, the Tribe filed a Motion for Withdrawal of Reference, seeking to have all proceedings in the action adjudicated in the United States District Court for the Eastern District of Michigan.  (ECF No. 3, Motion for Withdrawal of Reference, E.D. Mich. Bankr. Case

No. 12-06160.)  On January 7, 2013, the Gatzaros filed a Motion to Remand to Wayne County Circuit Court.  (ECF No. 11, Motion for Remand, E.D. Mich. Bankr. Case No. 12-06160.)  On January 22, 2013, the Tribe filed a response in opposition to the Motion for Remand.  (ECF No. 14, E.D. Mich. Bankr. Case No. 12-06160.)  On February 6, 2013, the Gatzaros filed a reply in support of their motion to remand.  (ECF No. 29, E.D. Mich. Bankr. Case No. 12-06160.)  Also on February 6, 2013, the Gatzaros filed a First Amended Complaint.  (ECF Nos. 27, 28, E.D. Mich. Bankr. Case No. 12-06160.)  As discussed in greater detail *infra* in Section (III)(C), the First Amended Complaint seeks to delete any claim for relief that would arguably violate a July 13, 2012 Claims Bar Order entered by this Court in an earlier Greektown-related Adversary Proceeding.

On February 18, 2013, before the Motion to Remand was heard by the Bankruptcy Court, the parties stipulated to entry of an Order by this Court withdrawing the reference and withdrawing the Gatzaros's motion to remand.  (ECF No. 4, Stipulation to Entry of Order Granting Defendants' Motion to Withdraw the Reference.)[1]  On February 22, 2013, this Court entered an Order Granting the Motion to Withdraw the Reference and ordering that the Gatzaros's motion to remand be withdrawn.  (ECF No. 5, Order Granting Motion of Sault Ste. Marie Tribe of Chippewa Indians and Kewadin Casinos Gaming Authority to Withdraw the Reference.)  On March 4, 2013, the Tribe filed the Motion to Dismiss for Failure to State a Claim and to hold the Gatzaros in contempt that is presently before the Court.  (ECF No. 7.)

### B.    The Prior Adversary Proceeding and This Court's Claims Bar Order

---

[1]  Going forward in this Opinion and Order, references to Electronic Case Filings ("ECF") will be to the current Adversary Proceeding before the Court, E.D. Mich. Case No. 13-10291, unless specifically noted otherwise.

4

On July 13, 2012, this Court approved a settlement between the Tribe and the Greektown Litigation Trust in a different Adversary Proceeding, *In re: Greektown Holdings, LLC, et al. v. Papas and Gatzaros*, (E.D. Mich. No. 12-cv-12340).  That Adversary Proceeding involved the claims of the Litigation Trust that certain defendants, including the Tribe and the Gatzaros, received fraudulent transfers which were subject to avoidance under section 544 of the Bankruptcy Code and under the Michigan Uniform Fraudulent Transfers Act ("MUFTA") (Mich. Comp. Laws § 566.32, et seq.).  The detailed background of that proceeding can be found in this Court's prior opinion and order.  *See In re Greektown Holdings, LLC*, 475 B.R. 563 (E.D. Mich. 2012).  As part of a settlement agreement reached between the Tribe and the Litigation Trustee in that Adversary Proceeding, this Court approved a Claims Bar Order that barred future claims against the Tribe arising out of or relating to the fraudulent transfers that were the subject of that proceeding.  *Id.* at 570.

Prior to approving the settlement agreement, this Court held a lengthy hearing, preceded by extensive briefing, on the issue of the fairness of the Claims Bar Order to the non-settling defendants in that case, in particular the Papas and Gatzaros defendants, who argued that they may have claims against the settling defendants that would be barred by the proposed Claims Bar Order.  The Court carefully considered each of the claims that the Papas and Gatzaros defendants argued they would be unfairly precluded from bringing against the Tribe in the future, and concluded that they had failed to identify any viable potential legal claims that they may have in the future against the Tribe that would be barred by the Claims Bar Order.  *Id.* at 574.  On August 9, 2012, the Court entered an Order approving the settlement agreement with the Claims Bar Order.  (ECF No. 16, *In re Greektown Holdings, LLC*, Order Approving Settlement Agreement, E.D. Mich. Adv. Pro. 12-12340.)

The Papas and Gatzaros defendants filed a motion for reconsideration of the Court's final approval of the Claims Bar Order, arguing that they had discovered "new evidence" since the Court had issued its final order, revealing a claim that the Papas and Gatzaros may have against the Tribe under a July 28, 2000 Guaranty Agreement. The Court denied the motion for reconsideration, finding that the Papas and Gatzaros defendants had knowledge of the Guaranty Agreement years before the hearing on the fairness of the Claims Bar Order, yet failed to ever suggest in any of the Greektown bankruptcy proceedings that they may have a claim under that agreement:

> Simply put, there is no dispute that the Guaranty Agreement, on which the Papas and Gatzaros Defendants base their motion for reconsideration, is evidence that was available but was not presented to the Court in connection with the Corrected Motion to Approve the Settlement Agreement between the Trustees and the Tribe Defendants and any legal theory based on the Guaranty Agreement should have been raised earlier. Even when the Papas and Gatzaros Defendants filed their "limited objection" to the language of the Claims Bar Order as initially approved by the Court, no mention was ever made of the Guaranty Agreement or of any possible claim that might wrongly have been barred by the Court's Order based on the existence of the Guaranty Agreement. The Papas and Gatzaros Defendants have offered no excuse for their failure to previously present this evidence and argument, and the Court declines to consider it now.

*In re Greektown Holdings*, No. 12-12340, 2012 WL 4484933 at *3 (E.D. Mich. Sept. 27, 2012) (internal citations omitted).

### C.     The Parties to This Adversary Proceeding and the Relevant Agreements

This Adversary Proceeding arises out of that belatedly-asserted July 28, 2000 Guaranty Agreement. (ECF No. 14, Pls.' Resp. to Mot. Dismiss, Ex. 3, Guaranty Agreement to Fund Subscription Amount ("Guaranty Agreement"); *Id.* Ex. 6, First Amended Complaint ("Compl.") ¶ 5.) Prior to July 18, 2000, the Gatzaros owned a substantial membership interest in Monroe Partners, LLC ("Monroe"), a Michigan Limited Liability Company that owned 50% of Greektown Casino, LLC ("Greektown Casino"), which owned and operated the Greektown Casino located in

6

the City of Detroit, County of Wayne, State of Michigan.  (Compl. ¶¶ 9-10.)

On July 28, 2000, Monroe redeemed the Gatzaros's entire membership interest for $265,000,000 pursuant to the "Amended and Restated Limited Liability Company Redemption Agreements with Monroe."  (Pls.' Resp., Ex. 1, Amended and Restated Limited Liability Company Redemption Agreement, p. 5 ("Redemption Agreement"); Compl. ¶ 11.)   The Redemption Agreement required Monroe to pay the $265,000,000 (the "Redemption Amount") in a series of "Liquidation Payments" over time.  (Redemption Agreement, pp. 7-8.)

Contemporaneous with the execution of the Redemption Agreement, Monroe sold the redeemed membership interests to Kewadin Greektown Casino LLC ("Kewadin Greektown") pursuant to the July 28, 2000 "Amended and Restated Limited Liability Company Subscription Agreement."  (Pls.' Resp., Ex. 2, Amended and Restated Limited Liability Company Subscription Agreement ("Subscription Agreement"); Compl. ¶12.)   The Subscription Agreement required Kewadin Greektown to pay the "Subscription Amount" ($265,000,000) to Monroe "at such time or times and in such amounts and manner as may be required to enable Monroe to pay the [Gatzaros] the principal and interest on the Liquidation Payments when due. . . ."  (Subscription Agreement, p. 3; Compl. ¶ 14.)

The Subscription Agreement required Kewadin Greektown ("the Subscriber") to obtain a limited guarantee from the Tribe to pay the Subscription Amount should Kewadin Greektown default on its obligation to pay the Subscription Amount to Monroe.  The Subscription Agreement provides in relevant part:

> If and to the extent the Mandatory Tax Distributions which are not Retained Tax Distributions are subject to any tax imposed by the Sault Tribe, the Authority or any instrumentality thereof, the Subscriber shall cause the Sault Tribe and the Authority to guarantee the payment of the Subscription Amount in the amount of such tax paid

to the Sault Tribe and/or Authority after default by the Subscriber in contributing the Subscription Amount and while such default remains uncured.

(Subscription Agreement, p. 4.)

Accordingly, also on July 28, 2000, the Tribe and Monroe entered into the Guaranty Agreement that is the subject of this action. (Pls.' Resp. Ex. 3, Guaranty Agreement; Compl. ¶ 15.) The Guaranty Agreement, at paragraph 2, describes the underlying obligation guaranteed by the Tribe and provides in full as follows:

> **Funding Obligation**. Subject to the limitations, terms and conditions set forth in this Guaranty Agreement, the Sault Tribe and the Authority, for value received, jointly and severally, unconditionally and absolutely guaranty to fund the Subscription Amount, as and when due from the Subscriber under the Subscription Agreement, upon an event of default by the Subscriber in making payment of the Subscription Amount, as and when due, and receipt by the Guarantors of notice and demand from Monroe (the "Funding Obligations").

(Guaranty Agreement, ¶ 2) (emphasis in original).

In paragraph 3, the Guaranty Agreement sets forth a limitation on the Tribe's guarantee, providing that the Funding Obligations of the Tribe and the Authority were limited to the amount of Tribal Tax Receipts, to the extent not included in calculating Greektown Distributions. Greektown Distributions constituted any and all distributions and payments of whatever nature made by Greektown Casino, Kewadin Greektown and/or Monroe to either the Authority or the Tribe on account of their ownership interest in, affiliation with or lending arrangements with Kewadin, Greektown Casino, LLC and/or Monroe. (Guaranty Agreement, ¶ 3; Compl. ¶ 18.) In other words, the Tribe was obligated on its guarantee only to the extent that the Tribe received payments from Greektown Casino in excess of certain thresholds. (Guaranty Agreement, ¶ 3.)[2]

---

[2] As discussed at greater length *infra* at Section (III)(A), the Tribe has always maintained, and the Gatzaros now concede, that those thresholds have never been met. As the Gatzaros observe in their

8

Paragraph 7 of the Guaranty Agreement provided that the Tribe would remain liable for amounts which it became obligated to pay under the Agreement in the event that any payments made to the Gatzaros were required to be returned, disgorged or rescinded.  Specifically, paragraph 7 provided in relevant part:

> Notwithstanding any prior revocation, termination, surrender or discharge of this Guaranty Agreement . . . the effectiveness of this Guaranty Agreement . . . shall automatically continue or be reinstated in the event that any payment received or credit given by Monroe in respect of the Funding Obligations is returned, disgorged or rescinded under any applicable state or federal law, including without limitation, laws pertaining to bankruptcy or insolvency, in which case this Guaranty Agreement . . . shall be enforceable against the Tribe and the Authority as if the returned, disgorged or rescinded payment or credit had not been received or given by Monroe . . . .

(Guaranty Agreement, ¶ 7.)

Under paragraph 8 of the Guaranty Agreement, the Tribe waived certain rights to notice of presentment and agreed that Monroe (and the Gatzaros as third party beneficiaries of the Guaranty Agreement)[3] could modify the terms of the Funding Obligation without notice to the Tribe. Paragraph 8 provides in relevant part:

> The Sault Tribe and the Authority waive notice of acceptance of this Guaranty Agreement and presentment, demand, protest, notice of protest, dishonor, notice of default, notice of intent to accelerate or demand payment of any Funding Obligations . . . and agree that Monroe may, once or any numbers of times, modify the terms of any Funding Obligations, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Funding Obligations, all without notice to the Sault Tribe and the Authority without affecting in any manner the unconditional obligation of the Sault Tribe and the Authority under this Guaranty Agreement.

---

Response: "The conditions in the "Limitations Provisions" which would have allowed repayment never occurred."  (ECF No. 14, Pls.' Resp. 5.)

[3]  No one disputes that the Gatzaros are intended third party beneficiaries under the Guaranty Agreement and have the same rights against the Tribe as Monroe.

(Pls.' Resp. Ex. 3, Guaranty Agreement, ¶ 8.)

Paragraph 8 also provides that the Tribe waives certain defenses it may have with regard to

its obligations under the Guaranty Agreement:

> The Sault Tribe and the Authority unconditionally and irrevocably waive each and
> every defense and setoff of any nature which, under principles of guaranty or
> suretyship, would operate to impair or diminish in any way the obligation of the
> Sault Tribe and the Authority under this Guaranty Agreement, and acknowledge that
> each such waiver is by this reference incorporated into each security agreement,
> collateral assignment, pledge and/or other document from the Sault Tribe and the
> Authority now or later securing this Guaranty Agreement and/or the Funding
> Obligations, and acknowledge that as of the date of this Guaranty Agreement, no
> such defense or setoff exists.

(Guaranty Agreement, ¶ 8.)

Paragraph 10 of the Guaranty Agreement provides that the Guaranty Agreement cannot be

modified without the written consent of the Tribe:

> This Guaranty Agreement constitutes the entire agreement of the Sault Tribe and the
> Authority and Monroe with respect to the subject matter of his Guaranty Agreement.
> No waiver, consent, modification or change of the terms of the Guaranty Agreement
> shall bind any of the Sault Tribe or Authority or Monroe unless in writing and signed
> by the waiving party or an authorized officer or manager of the waiving party, and
> then this waiver, consent modification or change shall be effective only in the
> specific instance and for the specific purpose given: provided, however, that Monroe
> shall not waive any terms of this Guaranty Agreement without first obtaining the
> written consent of all of the Retiring Members.

(Guaranty Agreement, ¶ 10.)

Pursuant to the terms of a November 10, 2004 Confidentiality and Standstill Agreement

("Standstill Agreement"), Monroe, the Gatzaros, the Tribe and Authority acknowledged and agreed

that $107,200,000 remained due and owing to the Plaintiffs accruing at 8% interest with a payment

due that day in the amount of $17,866,666.16.  (Pls.' Resp. Ex 4, Confidentiality and Standstill

Agreement, Ex. A; Compl. ¶ 23.)  On December 5, 2005, the Gatzaros, Monroe, Kewadin

10

Greektown, the Tribe and other parties entered into an Agreement pursuant to which the Gatzaros agreed to accept a payment from Greektown Holdings of $60,740,377 as full payment of all amounts due the Gatzaros under the Redemption/Standstill Agreements through November 10, 2006.  (Defs.' Mot. Ex. 5, p. 2; Compl. Ex. 5) ("the December 1, 2005 Agreement.")  The Gatzaros directed that $57,740,377 be paid directly to them[4] and that $3,000,000 be paid to Don H. Barden.  (*Id.*)  The December 1, 2005 Agreement also provided that the Gatzaros were to be paid an additional $58,000,000:  $20,666,666.67 on or prior to November 10, 2007, an additional $19,333,333.34 on or prior to November 10, 2008, and an additional $18,000,000 on or prior to November 10, 2009.[5] (*Id.*)

By May 29, 2008, Kewadin Greektown had breached its obligations under the Subscription Agreement, which caused Monroe to breach the Redemption Agreement by failing to pay the remaining $58,000,000 payment (which Gatzaros claim is now $73,903,863, presumably as a result of accrued interest).  (Compl. ¶ 28.)  On May 29, 2008, Monroe Partners and Kewadin Greektown filed separate Chapter 11 bankruptcies.

### D.    The Claim Against the Tribe in This Adversary Proceeding

In this Adversary Proceeding, the Gatzaros argue that the Tribe remains liable under the Guaranty Agreement, as recently unilaterally modified by the Gatzaros, to pay the Subscription Amount for the benefit of the Gatzaros as third party beneficiaries under the Guaranty Agreement. (Compl. ¶ 30.)  On October 18, 2012, the Gatzaros notified the Tribe that they had unilaterally

---

[4]  This is the amount that is the subject of the MUFTA Adversary Proceeding. (The "MUFTA payment.")

[5] These amounts (plus accrued interest) are the subject of this Adversary Proceeding.  (The "Unpaid Money Claim.")

modified paragraph 8 of the Guaranty Agreement as follows:

> <u>Funding Obligation</u>. The Sault Tribe and Authority, for value received, jointly and severally, unconditionally and absolutely, guaranty to fund the Subscription Amount upon the event of default by the Subscriber in making the payment of the Subscription Amount upon receipt by the Guarantors of notice and demand from Monroe and/or any other Retiring Members. As of October 17, 2012, the Guaranty is no longer subject to the Section 3 hereunder, entitled "Limitation." The Tribe and/or Authority shall immediately pay to Ted Gatzaros and Maria Gatzaros, as Retiring Members, upon delivery of written demand, all sums due them, including all principal and interest, arising from the Subscriber's default of the Subscription Agreement.

(Compl. ¶ 31; Pls.' Resp. Ex. 5, Oct. 18, 2012 Letter from Thomas Stroble to the Tribe.)

The revised Funding Obligation paragraph removes the significant Limitation Provision of the Guaranty Agreement, which obligated the Tribe to pay the Subscription Amount only when and if the Tribe received a certain threshold of distributions from the Greektown Casino. As all parties now concede, those thresholds were never reached, so that under the Guaranty Agreement as originally written, the Tribe was never obligated, and could not now be obligated, to pay the Subscription Amount on Kewadin's breach of the Subscription Agreement. However, under the terms as Gatzaros have revised them, that Limitation Provision is removed and the Gatzaros seek immediate payment from the Tribe of $73,903,863.00, i.e. the $58,000,000 (presumably plus some amount of interest) that remains unpaid under the December 1, 2005 Agreement. (Compl. ¶ 32.) The Tribe argues that the Gatzaros Defendants cannot modify the Guaranty Agreement to remove the Limitation Provision without the consent of the Tribe, and have filed this motion to dismiss for failure to state a claim.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted.  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  But the court "need not accept as true legal conclusions or unwarranted factual inferences."  *Id*. (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id*. at 555 (internal citations omitted). Dismissal is appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Id.* at 570.  The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Id.* at 1948-50. A plaintiff's factual allegations, while "assumed to be true, must do more than create

speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 127 S.Ct. at 1965). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527 (citing *Twombly*, 127 S.Ct. at 1969).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint or that are central to plaintiff's claims (2) matters of which a court may take judicial notice (3) documents that are a matter of public record and (4) letters that constitute decisions of a government agency. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). *See also Greenberg v. Life Ins. Co. Of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings). Where the claims rely on the existence of a written agreement, and plaintiff fails to attach the written instrument, "the defendant may introduce the pertinent exhibit," which is then considered part of the pleadings. *QQC, Inc. v. Hewlett-Packard Co.*, 258 F. Supp. 2d 718, 721 (E.D. Mich. 2003). "Otherwise, a plaintiff with a legally deficient claims could survive a motion to dismiss simply by failing to attach a dispositive document." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997).

## III.   ANALYSIS

In their brief on appeal to the Sixth Circuit Court of Appeals challenging this Court's "Order Approving Settlement" in the prior Adversary Proceeding (E.D. Mich. No. 12-12340), the Gatzaros Defendants argued that they may have a claim against the Tribe because "whether the terms of the

14

Guaranty Agreement have been triggered remains an open question." (*In re Greektown Holdings, LLC*, Case No. 12-2434 (6th Cir. 2013) (Document No. 006111578497, Brief of Defendants/Appellants, p. 33). However, the Gatzaros now finally concede that the conditions of the Limitation Provision, that "would have" triggered the Tribe's Funding Obligation under the Guaranty Agreement, never occurred. In their brief in response to the Tribe's motion to dismiss in this case, the Gatzaros state: "The conditions in the 'Limitations Provisions' which would have allowed repayment have never occurred." (Pls.' Resp. at 5.) Conceding that they have no claim against the Tribe under the Guaranty Agreement as written, the Gatzaros have unilaterally modified the Guaranty Agreement to remove the Limitation Provision: "Plaintiffs exercised their rights under the "Waivers" Provision to modify, extend and increase Defendants' "Funding Obligation" without notice so that the "Funding Obligations" were no longer subject to the restrictive repayment limitations." (*Id*. at 5-6.)

> A.   **The Parties Agree That the Limitation Provision of the Guaranty Agreement Cannot be Modified Without the Written Consent of the Tribe and the Gatzaros Cannot Unilaterally Excise the Limitation Provision from the Guaranty Agreement.**

Paragraph 10 of the Guaranty Agreement, quoted in full *supra*, provides in pertinent part that any modification or change of the terms of the Guaranty Agreement must be in writing and signed by the party against whom the modification or change is asserted: "No waiver, consent, modification or change of the terms of the Guaranty Agreement shall bind any of the Sault Tribe or Authority or Monroe unless in writing and signed by the waiving party . . . ." (Guaranty Agreement, ¶ 10.) Relying on this provision, the Tribe argues that the Gatzaros cannot unilaterally modify the Guaranty Agreement by removing the Limitation Provision (Paragraph 3), without the consent of the Tribe, which they have not obtained. Gatzaros agree. "Plaintiffs also agree with Defendants that

15

they cannot modify any other provision in Guaranty [sic], including the "Limitation Provision," without [the Tribe's] written consent."  (ECF No. 14, Pls.' Resp. 9.)

Gatzaros argue, however, that they are expressly authorized, under Paragraph 8 of the Guaranty Agreement, to modify the terms of the Funding Obligations (Paragraph 2) without notice to the Tribe.  Paragraph 8, quoted in full *supra*, provides in pertinent part that Monroe (and the Gatzaros as third party beneficiaries) may "modify the terms of any Funding Obligations," and may "compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Funding Obligations, all without notice to the Sault Tribe and the Authority and without affecting in any manner the unconditional obligation of the Sault Tribe and the Authority under this Guaranty Agreement."  (Guaranty Agreement ¶ 8.)  Gatzaros assert that the Limitation Provision (Paragraph 3) is a "term" of the Funding Obligation and therefore can be modified by them without notice to the Tribe and argue that they have the right to extend and increase the Funding Obligation so that the Tribe's obligations are no longer subject to the restrictive limitations of Paragraph 3, all without notice to the Tribe.  (Pls.' Resp. 10-11.)

The Funding Obligation paragraph provides:

> **Funding Obligation**.  Subject to the limitations, terms and conditions set forth in this Guaranty Agreement, the Sault Tribe and the Authority, for value received, jointly and severally, unconditionally and absolutely guaranty to fund the Subscription Amount, as and when due from the Subscriber under the Subscription Agreement, upon an event of default by the Subscriber in making payment of the Subscription Amount, as and when due, and receipt by the Guarantors of notice and demand from Monroe (the "Funding Obligations").

(Guaranty Agreement, ¶ 2) (emphasis in original).  To reach their conclusion that they are authorized to unilaterally remove paragraph 3, the Limitation Provision, from the Guaranty Agreement, and to demand payment from the Tribe even though the thresholds for repayment contained in the

16

Limitation Provision were never reached, Gatzaros argue that the phrase "subject to the limitations" in the Funding Obligations paragraph is a "term" of the Funding Obligations and that therefore paragraph 8 gives them the right to "modify" that "term" by "unsubjecting," if you will, the Tribes's payment obligation to the Limitation Provision.   Specifically, Gatzaros argue: "Defendants have failed to appreciate that the words "subject to the limitations" are "terms" within the "Funding Obligations" that Plaintiffs are authorized to unilaterally modify. . . . Under Michigan law, Plaintiffs have the right to modify the "terms" of the "Funding Obligations" to state that they are no longer "subject to the limitations" within the Guaranty."  (ECF No. 14, Pls.' Resp. 9.)

The Tribe responds that the "Funding Obligations" that the Gatzaros are empowered by the waiver provision of paragraph 8 to modify, without the consent of the Tribe, is the Subscription Amount, i.e. the underlying financial indebtedness due to Monroe from Kewadin and guaranteed by the Tribe.  Under Paragraph 2, "Funding Obligations," the Tribe agrees "to fund the Subscription Amount, as when due from the Subscriber under the Subscription Agreement, upon the event of default by the Subscriber in making payments of the Subscription Amount . . . ."   The Tribe submits that the language of the waiver provision of paragraph 8 is nearly identical to language found in a standard Michigan UCC Form, Article 9 Secured Transactions, Part 2A, General Agreements, that clearly relates to waiver of rights with respect to payment of an underlying indebtedness.   Other provisions of the Guaranty Agreement also refer to "payment" of the Funding Obligations by the Tribe and others.  *See, e.g.*, Paragraph 6 ("The Sault Tribe and the Authority agree that no security now or later held by Monroe for the payment of any Funding Obligations, whether from the Subscriber, either the Sault Tribe and/or the Authority, or otherwise . . ."); ("The Sault Tribe and the Authority acknowledge and agree that Monroe has no obligation to acquire or perfect any lien

17

on or security interest in any assets, whether realty or personalty, to secure payment of the Funding Obligations . . .").

The Gatzaros argue that the "Funding Obligations" are not the same as the underlying obligations to pay the Subscription Amount and that the term "Funding Obligations" is employed only in the Guaranty Agreement and only to define the Tribe's obligations. This proposition is directly at odds with the language of Paragraph 6, quoted just above, that clearly contemplates that the Funding Obligations, i.e. the underlying debt, could be paid by the Subscriber, the Tribe, the Authority "or otherwise." The Gatzaros have not adequately explained to the Court how their argument that the term "Funding Obligations" defines only the Tribe's obligations can be squared with the language of Paragraph 6.

Gatzaros assert that the "Funding Obligations" do not "constitute the underlying obligation because only the "Funding Obligations" are expressly subject to limitations that prevent the total amount of the underlying obligation from being paid by Defendants." (ECF No. 14, Pls.' Resp. 12 n. 2.) The Court fails to see the logic of this argument - the fact that Paragraph 3 imposes a limitation on the Tribe's obligation to fund the Subscription Amount in the event of a default by Kewadin does not alter the definition of the Subscription Amount – the underlying indebtedness. In the event that the thresholds described in Paragraph 3 had been met, the Tribe's obligation to fund the entire underlying indebtedness, i.e. the entire Subscription Amount, in the event of a default by Kewadin, was unconditional. Gatzaros assert that "they do not have the right to modify Kewadin's underlying debt." (*Id.*) Yet it is undisputed that they did exactly that on several other occasions, for example in the December 1, 2005 Agreement, when they both reduced the amount owed to them and extended the payment terms.

18

If the "Funding Obligations" are understood to be the underlying indebtedness, i.e. the Subscription Amount, the fallacy of the Gatzaros's position is clear.  The Gatzaros's interpretation of the Waiver Provision gives them the right to alter, at their whim, not just the terms of the underlying indebtedness but the terms of the Guaranty Agreement itself, which expressly makes the Funding Obligation subject to the Limitation Provision of Paragraph 3.   The Waiver Provision of Paragraph 8 gave the Gatzaros the right to modify the terms of, or to accelerate payment of, the Funding Obligations, not the right to modify the terms of the Guaranty Agreement, which importantly subjects the Tribe's obligation to a significant limitation.

The very language employed by the Gatzaros to accomplish the modification illustrates that they have modified the Guaranty Agreement, not the underlying Funding Obligation.  First, the proposed modification deletes entirely the introductory, limiting language of Paragraph 2, "Subject to the limitations, terms and conditions set forth in this Guaranty Agreement."  This language is just gone. After defining the event of default, the modification then goes on to add the following entirely new language: "As of October 17, 2012, the Guaranty is no longer subject to the Section 3 hereunder, entitled "Limitation."  The Tribe and/or Authority shall immediately pay to Ted Gatzaros and Marie Gatzaros . . . all sums due them . . . arising from the Subscriber's default of the Subscription Agreement."  (ECF No. 14, Pls.' Resp. 6.)  Nothing in this modified language refers to the Funding Obligations.  The modification simply removes the language that subjects the Funding Obligation to Paragraph 3 and then asserts that Paragraph 3 is no longer operative.  None of this language relates to a modification of the terms of underlying obligation.

While the Gatzaros concede that they cannot modify the terms of the Limitation Provision, Paragraph 3, without the consent of the Tribe, they do precisely that by plucking that limitation out

19

of the Paragraph defining the Funding Obligation.  Under this interpretation, the Gatzaros could

have at any time, even the day after the Agreement was signed, unilaterally removed the Greektown

Distribution Limitation and demanded payment of the Tribe for the Subscription Amount.  Clearly

such an absurd result does not follow inescapably from the contractual language.  Such a reading

of the Guaranty Agreement entirely eliminates Paragraph 3, which Gatzaros agree they have no

contractual right to modify, let alone eliminate.

Basic, controlling rules of contract construction preclude the Gatzaros's interpretation of the

Guaranty Agreement:

> It is a cardinal principle of construction that a contract is to be construed as a whole;
> that all its parts are to be harmonized so far as reasonably possible; that every word
> in it is to be given effect, if possible; and that no part is to be taken as eliminated or
> stricken by some other part unless such a result is fairly inescapable.
>
>    *     *     *
>
> Every word in the agreement must be taken to have been used for a purpose, and no
> word should be rejected as mere surplusage if the court can discover any reasonable
> purpose thereof which can be gathered from the whole instrument.

*Associated Truck Lines, Inc. v. Baer*, 346 Mich. 106, 110 (1956) (citation omitted).  *See also W.C.*

*Ducomb Co., Inc. v. Ann Arbor Machine Co*., No. 301988, 2012 WL 516089, at *4 (Mich. Ct. App.

Feb. 16, 2012) ("[A] contract is to be construed in its entirety. All of its parts are to be harmonized

so far as reasonably possible, and no part is to be taken as eliminated or stricken by some other part

unless such a result is fairly inescapable.") (citations omitted) (unpublished); *51382 Gratiot Ave.*

*Holdings, LLC v. Chesterfield Development Co., LLC*, No. 11-12047, 2012 WL 205843, at *7 (E.D.

Mich. Jan. 24, 2012) ("'[N]o part [of a contract] is to be taken as eliminated or stricken by some

other part unless such a result is fairly inescapable.'") (quoting *Associated Truck Lines*, *supra*)

(alteration in original).  Importantly, contracts should be interpreted where possible to avoid absurd

or unreasonable results.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp*., 511

20

F.3d 535, 545 (6th Cir. 2007) ("'[C]ontracts must be construed consistent with common sense and in a manner that avoids absurd results.'") (quoting *Kellogg Co. v. Sablhok*, 471 F.3d 629, 636 (6th Cir. 2006) (citing *Parrish v. Paul Revere Life Ins. Co*., 103 Mich. App. 95 (1981)). *Almetals, Inc. v. Wickeder Westfalenstahl, Gmbh*, 08-10109, 2008 WL 2026122 (E.D. Mich. May 12, 2008) (observing that "'contracts must be construed consistent with common sense and in a manner that avoids absurd results'") (quoting *Certified Restoration*).

Applying these interpretive principles, it is clear that the proposed unilateral modification, however it is characterized, seeks to modify the terms of the Guaranty Agreement, not the terms of the underlying Funding Obligation. The Limitation Provision is a separate term of the Guaranty Agreement, not a term of the Funding Obligation. The Gatzaros's argument admits as much when they assert that the "Waivers" Paragraph "addresses Plaintiffs' limited rights to make modifications to the "Funding Obligations" *Provision* without notice." (ECF No. 14, Pls.' Resp. 8) (emphasis added). In order to reach the conclusion they suggest, the Gatzaros are forced to insert the word "Provision" into the Waiver Paragraph – the Waiver provision as written permits modification of the "terms of any Funding Obligations," not the terms of the Funding Obligations "*Provision*."

A straightforward reading of the contractual language compels the conclusion that the Gatzaros have attempted a modification of the terms of the Guaranty Agreement itself, specifically Paragraph 3, not of the terms of any Funding Obligations. By their own admission, they cannot do so without the consent of the Tribe. The parties negotiated an important limitation on the Tribe's guaranty obligation tied to the amount of distributions the Tribe received from the Greektown Casino. It was never contemplated that the Tribe would be liable to the Gatzaros if the Distributions never reached the agreed upon levels spelled out in Paragraph 3. Yet that is the result that the

Gatzaros's unilateral modification will achieve.   It would be an absurd result to permit the Gatzaros to simply eliminate by fiat this important, bargained for limitation.

The Gatzaros argue that the elimination of the Limitation Provision is "a fairly inescapable result" given the language of the Waiver provision.  They assert that use of the terms "modify," "extend" and "increase" to describe the actions that the Gatzaros are authorized to undertake without giving notice to the Tribe leads to the conclusion that the Limitations Provision "can be nullified, stricken or eliminated." (Pls.' Resp. 11.)   But this merely states the legal conclusion without advising why this result is inescapable given a reasonable reading of the Guaranty Agreement as a whole.  "Every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument."   *Associated Truck Lines*, 346 Mich. at 110.  The Gatzaros assert that a "guaranty which does not guaranty repayment of any part of the debt from the guarantors is not a guaranty at all." (Pls.' Resp. 12.)  But this ignores the fact that the guaranty was "absolute" and "unconditional" in the event that the Greektown Distributions to the Tribe reached a certain floor.  The Gatzaros could have refused to agree to that Limitation, but they did not.  At the time that the Guaranty Agreement was executed, the Tribe had already contributed over $100 million to the Greektown Casino and thus they negotiated a limit on their obligation to guaranty the debt that was tied to the future success of the Casino.  Because those negotiated limits were never reached, the Gatzaros want to rewrite the Agreement and remove this Limitation to which they agreed.  They concede that they are powerless to remove the Limitation Provision without the Tribe's consent, yet they do just that through their strained interpretation of Paragraph 8. "Contractual language is construed according to its plain and ordinary meaning, and technical or

constrained constructions are to be avoided." *Dillon v. DeNooyer Chevrolet Geo*, 217 Mich. App.

163, 166 (1996).   The Gatzaros have failed to convince the Court that the law supports an

interpretation of the relevant contractual language that would give them a right to unilaterally excise

an important term of the Guaranty Agreement.[6]

> ### B.      The Tribe Waived Only Defenses Related to Guaranty/Suretyship, None of Which is Being Asserted in This Action

The Gatzaros argue that the Tribe should be precluded from asserting any defenses in this

action because they have waived every conceivable defense in the Waivers provision of the

Guaranty Agreement.  The Waiver Provision, Paragraph 8 of the Agreement, states in pertinent part:

> The Sault Tribe and the Authority unconditionally and irrevocably waive each and
> every defense and setoff of any nature which, under the principles of guaranty and
> suretyship, would operate to impair or diminish in any way the obligation of the
> Sault Tribe and the Authority under this Guaranty Agreement.

(Guaranty Agreement ¶ 8.)

The waiver clearly is limited to defenses which, "under principles of guaranty and

suretyship," would diminish the obligation of the Tribe.[7]  The cases cited by the Gatzaros are easily

---

[6] Gatzaros also argue that if there is a conflict between the Waivers Provision (Paragraph 8) and the General Provision requiring the Tribe's consent (Paragraph 10), the first of two conflicting provisions controls.  However, there is no conflict between the two unless the Court adopts the Gatzaros's untenable interpretation.

[7] For purposes of this analysis, the distinctions between the two mechanisms, i.e. "suretyship" and "guaranty," are immaterial.  "A 'surety' is typically jointly and severally liable with the principal obligor on an obligation to which they are both bound, while a 'guarantor' typically contracts to fulfill an obligation upon the default of the principal obligor. The provisions of a particular guaranty or suretyship contract, however, will often blur much of this distinction. Although there are important differences between the two mechanisms that should not be obscured, these differences relate to the duties contractually imposed on the secondary obligor by the secondary obligation and not to the nature of the rights inherent in suretyship status."  Restatement (Third) of Suretyship and Guaranty § 1 (1996).

distinguishable as each involved a much broader waiver or, in the one case that contains similar language, the defense asserted was in the nature of a suretyship defense.  In *Shorebank v. Bayview Apartments, LLC*, No. 09-cv-306, 2010 WL 331707 (W.D. Mich. Jan. 22, 2010), the agreement contained a nearly identical waiver provision, in which the guarantor "unconditionally and irrevocably waive[d] each and every defense which under principles of guaranty or suretyship law would otherwise operate to impair or diminish the liability of the Guarantor for the Indebtedness." *Id*. at *5.  In that case, the defense was that demand had never been made as expressly required under the guaranty and the guarantor had expressly waived notice of demand and presentment. Accordingly, the defense was one arising under principles of guaranty or suretyship.  In this case, the defenses arise under general principles of contract law, not under laws specific to principles of guaranty or suretyship.  Also in *Shorebank*, the court found it important that the guarantor failed to respond to the complaint or to the motion to dismiss and put forth no argument that the guaranty agreement should have been interpreted differently than Shorebank had interpreted the agreement. *Id*. at *5.  This is not the case here where the Tribe strongly disputes the Gatzaros's interpretation of the Guaranty Agreement.

In *Morris v. Comerica Bank*, No. 245563, 2004 WL 1801034 (Mich. Ct. App. Aug. 12, 2004), the issue was whether there had been a waiver of the defense of a violation of the covenant of good faith and fair dealing.  The waiver language provided in pertinent part that the guarantor "unconditionally and irrevocably waive(s) each and every defense and setoff of any nature which, under the principles of guaranty or otherwise, would operate to impair or diminish in any way the obligation of the undersigned under this Guaranty."  *Id*. at *5.  The addition of the language "or otherwise" easily distinguishes this case.  Likewise, in *L. Perrigo Co. v. Robins*, No. 08-cv-00348,

24

2009 WL 2095990, at *3 (W.D. Mich. July 14, 2009), the guarantor "waive[d] any and all defenses, claims, and discharges of Debtor or any other obligor with respect to the Indebtedness, except the defense of discharge by payment."

Similarly, in *U.S. Bank, Nat. Ass'n v. Rosenberg*, No. 12-723, 2013 WL 272061 (E.D. Pa. Jan. 24, 2013), the guarantor waived, among other defenses more specifically, "any defense, right of set-off, claim or counterclaim whatsoever and any and all other rights benefits, protections and other defenses available to the Guarantor now or at any time hereafter." *Id*. at *3. The waiver was not restricted to guaranty and/or suretyship defenses. Likewise, in *Manning v. Mercatanti*, 898 F. Supp. 2d 850, 857 (D. Md. 2012), the guarantor "expressly waive[d] and surrender[ed] any defense to its liability hereunder, or any right of counterclaim or offset of any nature or description which it may have or which may exist based upon, and shall be deemed to have consented to, any of the foregoing acts, omissions, things, agreements or waivers." (Emphasis omitted).

*United States v. Mallett*, 782 F.2d 302 (1st Cir. 1986), in which the court held that the loan guaranty, which waived notice of presentment and demand, barred defenses based on a failure to timely notify the guarantor of the nature of the default, offers no apt analogy to the waiver at issue in this case. Nor do *Merillat Indus., Inc. v. Johnston*, 865 F. Supp. 60, 63 (D. Mass. 1994) (guarantor waived all legal or equitable defenses available to a guarantor) or *J. Remora Maintenance LLC v. Efromovich*, No. 650943/2011, 2012 WL 75646, at *1 (N.Y. Sup. Jan. 4, 2012) (guarantor "waive[d], and agree[d] not to assert any defense in this action, suit or proceeding for the interpretation of this Guaranty ... that this Guaranty or any related document may not be enforced in or by" this court") support the Gatzaros's interpretation of the provision at issue in this Guaranty Agreement.

Each of these cases stands for the proposition, not disputed by the Tribe, that broadly worded waiver of defense provisions, standard in many guaranty agreements, are enforceable. The Gatzaros have failed to unearth a case that interprets waiver of defense language similar to that at issue here, i.e. that is expressly limited to defenses based upon principles of guaranty or suretyship, to preclude the guarantor from asserting non-suretyship defenses. The typical suretyship defenses are release, extension or modification of the underlying obligation, impairment of collateral and impairment of recourse. Restatement (Third) of Suretyship §§ 39-44. Waiver of these specific defenses is common. "The secondary obligor, if it so chooses, may forego [these defenses.] Indeed, in many suretyship contexts, it is routine to do so." *Id*. § 48. The waiver given by the Tribe in the Guaranty Agreement related to these specific defenses, those based on "principles of guaranty or suretyship." The Tribe did not thereby waive defenses unrelated to these specific suretyship defenses, such as breach of the duty of good faith and fair dealing or the defense that an interpretation of the agreement that eliminates a provision or renders it illusory should be avoided. Importantly, even if the defenses being asserted by the Tribe in this action did relate to these suretyship defenses, the Gatzaros would not necessarily be relieved of their duty of good faith and fair dealing in relation even to those particular defenses. "Whether . . . a particular consent or waiver [of suretyship defense] violates [] standards [of good faith and fair dealing] may depend on the content of the consent or waiver and its context." Restatement (Third) Suretyship § 48 comment a.

In the Guaranty Agreement, the Tribe expressly waived any defense that would rest on principles of guaranty or suretyship. The Gatzaros have failed to support their legal contention that this waiver should extend to *any* defense that the Tribe may assert in this case. The Court concludes that the Tribe is not precluded from asserting the non-suretyship defenses it relies on this action.

26

**C.      The Claims in The First Amended Complaint are Not Barred by the Court's Claims Bar Order**

In an effort to address the Tribe's contention that the Gatzaros instituted this action in violation of this Court's July 13, 2012 Claims Bar Order, which precluded claims that arise out of or flow from the fraudulent transfers at issue in the prior MUFTA Adversary Proceeding, the First Amended Complaint removes any claim for relief based upon the following language of the revision of the Guaranty Agreement:

> The Sault Tribe and Authority are also liable to reimburse any sums paid by the [sic] Ted Gatzaros and/or Maria Gatzaros, as Retiring Members, to Buchwald Capital Advisors, LLC, as litigation Trustee, or any other person or entity arising from the United States Eastern District Court and United States Bankruptcy Court Cases identified by case numbers 08-53414 and 2:12-CV-12340-PDB-RSQ.  The Sault Tribe and Authority are also liable to Ted Gatzaros and/or Maria Gatzaros, as Retiring Members, for all cost of collection of the amounts due hereunder, including their actual attorney fees.

Accordingly, the Gatzaros seek in this action only the unpaid amounts ($58,000,000 plus interest) under the December 1, 2005 Agreement, that they argue are now due and owing to them as third party beneficiaries of Guaranty Agreement. (Compl. ¶ 32.) These amounts were never paid and therefore do not relate to or flow from the fraudulent transfers that were the subject of the MUFTA and were the object of this Court's Claims Bar Order.

Although they have not conceded as much in connection with this motion, the Tribe did concede this point in the prior Adversary Proceeding. In their response to the Papas and Gatzaros defendants motion for reconsideration in the previous Adversary Proceeding, the Tribe admitted that the Claims Bar Order was not intended to cover the Gatzaros's "unpaid money claim" that arises out of the December 1, 2005 Agreement, because "that claim does not arise out of or reasonably flow from the facts or allegations or claims in the MUFTA Adversary Proceeding, which facts and claims

27

involve actual transfers to the Gatzaros Defendants in 2005, and do not involve unpaid amounts to be paid in the future." (ECF No. 26, Limited Response of the Tribe to Motion for Reconsideration, p. 10 n. 8, Adv. Pro. No. 12-12340.)

The Court, therefore, denies the Tribe's request to hold the Gatzaros in contempt of Court for violating this Court's July 13, 2012 Claims Bar Order by seeking to recover amounts that the Gatzaros Defendants may be found liable for in the fraudulent transfer Adversary Proceeding previously before this Court. By removing the claim for these amounts in their First Amended Complaint, which was filed before the Tribe's responsive pleading and therefore filed as of right, the Gatzaros have avoided the argument that the claims asserted in this action arise out of the MUFTA proceeding.

The Court concludes that the claims that are asserted in the First Amended Complaint, which seek to recover payments that were never made, do not flow from the fraudulent transfers that were paid to and received by the Gatzaros and therefore the claims are not subject to and not barred by the Court's Claims Bar Order. Accordingly, the Court must deny that portion of the Tribe's motion that seeks to hold the Gatzaros in contempt of this Court's previously-issued Claims Bar Order.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Tribe's Motion to Dismiss and DENIES the motion to hold the Gatzaros in contempt.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: July 9, 2013

28

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 9, 2013.

<div style="margin-left:40%">

s/Deborah R. Tofil<br>
Deborah R. Tofil<br>
Case Manager (313) 234-5122

</div>